HON. ASA O. ALDIS, } ASSISTANT JUDGES.
HON. JAMES BARRETT, }.

---

*In re* JESSE COOPER.*

*Habeas corpus. Exceptions. Contempt of court. Justices of the peace.*

Issues and questions of law arising upon the trial of a writ of *habeas corpus* before the county court, may be passed to the supreme court upon exceptions.

---

* This cause was decided at the General Term at Woodstock, in November, 1858, but the papers were not furnished to the Reporter in season to be printed with the other cases of that term.

*In re* Jesse Cooper.

A court, which has power to punish for contempt, is the exclusive judge whether misbehavior in court amounts to contempt or not; and the exercise of such power in such cases cannot be revised by any other tribunal.[*]

Justices of the peace while holding courts have power to punish for contempt.

HABEAS CORPUS brought before the county court at the December Term, 1857, and directed to Silas G. Bean, sheriff of Orleans county. The relator stated in his petition that on the 10th of June, 1857, at the trial of one Bergin for petit larceny, before Thomas Guild, Esq., a justice of the peace for Orleans county, the complainant was acting as counsel for Bergin ; that some preliminary question was raised and discussed by the counsel, and decided by Justice Guild, who, after deciding the question, remarked to the complainant that " it might be convenient enough for Mr. Cooper to have the supreme court sit here all the time ;" that the complainant replied, " I dont think that is necessary, for I think this magistrate wiser than the supreme court;" that the justice instantly replied, " you are fined ten dollars for contempt ;" that on the 27th of October, 1857, the complainant was arrested and was still imprisoned by Bean, by virtue of a *mittimus* issued by Justice Guild, reciting that at a justice court held by him at Irasburgh, on the 10th of June, 1857, the complainant was by said court adjudged guilty of a contempt of said court, and of the authority thereof, in an open public session of the same, and was by said court ordered therefor to pay to the treasurer of the town of Irasburgh a fine of ten dollars, and to stand committed to jail until such order should be complied with. The *mittimus* directed the officer upon the neglect or refusal of the complainant to pay such fine, to commit him to jail until he should pay the same with the costs of commitment, or be otherwise discharged according to law.

The sheriff's return to the writ of *habeas corpus* set forth this *mittimus* with his return thereon, showing the arrest and commitment of the relator by virtue thereof, on the 27th of October, 1857, and stated that directly after such commitment the relator

---

[*] NOTE. Except by the supreme court upon *habeas corpus*, when it is made to appear that the contempt was committed through ignorance, mistake or misapprehension, or by acting in good faith under the advice of counsel, and that relief may be granted without impairing the right of any parties concerned. See Acts of 1855, No. 7, p. 11.—REPORTER.

was suffered by the sheriff to go at large, the sheriff, however, regarding him as in custody under said process.

The relator demurred to this return, but the county court, at the June Term, 1858,—POLAND, J., presiding,—decided that the relator was not unlawfully restrained of his liberty, and that he be remanded to the custody of the sheriff, to which decision the relator excepted.

The relator, *pro se.*

*Peck & Colby,* for the people.

ALDIS, J.　The relator brought his writ of *habeas corpus* before the Orleans county court, at their December Term, 1857. The case was heard upon demurrer to the return of the sheriff and the accompanying papers. The court decided that the relator was not unlawfully imprisoned. To this decision he excepted, and the case passed to the supreme court.

I. It is objected that a bill of exceptions is not properly allowable in such a case; that the proceedings of the county court upon *habeas corpus* are not to be revised in the supreme court.

Where, as in this case, the petition is brought and the case heard in the county court, and not by a single judge, we think the proceedings fall within the very terms of the statute. The words of the statute are very comprehensive. They are, "*all* issues of law determined by the county court," etc., chap. 28, sec. 43, Comp. Stat.; and, " exceptions to the opinion of the county court on *any* question of law," etc., may pass to the supreme court; chap. 28, sec. 44. As this was the trial of an issue of law by the county court, it clearly comes within the words of the act. It comes within the spirit of the law. Very important questions, affecting the liberties of the citizens of the State, arise upon the trial of petitions in *habeas corpus.* In matters of such moment the law should be settled and uniform. Without revision by the supreme court the ·decisions of the different tribunals in which such questions are heard will become conflicting, and the important rights involved will be left in uncertainty. Justice to the person imprisoned requires, that he should have the oppor-

tunity of having the decision of the county court revised, when the decision remands him to jail, and the question involved is one merely of law.

II. It is alleged by the petitioner that the language used by him to the magistrate is not and cannot be a contempt, and therefore that the proceedings to punish for contempt have no basis to rest upon. The contempt here punished, if a contempt at all, comes under the head of misbehavior in court, of personal insult to the magistrate. In determining whether the language used was or was not a contempt, regard must be had, not merely to the very words used, but to the surrounding circumstances; the connection in which they were used, the tone, the look, the manner, the emphasis. These give meaning to the words, and might satisfy every bystander that they were used in an ironical and insulting sense. Of such contempts the court to whom they are offered, or in whose presence they arise, must be the exclusive judge, as the punishment for them should be immediate and on the spot,

If the magistrate has the power to punish for contempt, and has jurisdiction of the subject matter and the parties, his exercise of the power within his jurisdiction upon alleged acts of misbehavior in court, cannot be properly revised by any other tribunal. This has been so held in all cases where the power has been legally exercised by superior courts. If the exercise of the power by the county courts, or by a single judge or chancellor, is not to be revised by the supreme court, we see no reason why the action of a justice of the peace should be subject to revision, so long as he acts within his jurisdiction, and his proceedings are legal, and the punishment inflicted does not exceed his jurisdiction. The decision in *Vilas & Platt* v. *Burton*, 27 Vt. 60, is directly in point to show that the action of a chancellor is not so revisable.

It is urged that the power may be abused, and therefore that its exercise should be revisable. The same argument would apply to every court whose proceedings can be brought before a higher one. If the use of this power should become oppressive, the legislature would doubtless interpose to restrain it. In other States and in congress, statutes have been passed to modify and

*In re* Jesse Cooper.

regulate the use of it. In this State there has been no tendency to the abuse of the power; on the contrary, this is believed to be almost the first instance of its exercise by a magistrate. Jealous as the people of this State are of any the slightest encroachment upon personal liberty, there is little danger that courts or magistrates will use the power in a tyrannical manner, or to gratify malicous or vindictive feelings.

III. The relator insists that justices of the peace have no power to punish for contempt. This position is untenable.

The power to punish for contempt is inherent in the nature and constitution of a court. It is a power not derived from any statute, but arising from necessity; implied, because it is necessary to the exercise of all other powers. It is indispensable to the proper transaction of business. It represses disorder, violence and excitement, and preserves the gravity, tranquility, decorum and courtesy that are necessary to the impartial investigation of controversies. It secures respect for the law by requiring respect and obedience to those who represent its authority. Its exercise is not merely personal to the court and its dignity; it is due to the authority of law and the administration of justice.

In England this power is not confined to the superior courts. It is exercised by the courts of quarter sessions, a tribunal composed of two justices of the peace, and charged with the trial of inferior offences; *Rex* v. *Clement*, 4 B-rn & Ald. 229. So the court leet, a tribunal of still inferior jurisdiction, had the same power; 8 Coke 38 *b*.

The power is generally regarded, both in England and in this country, as incident to all courts of record; 11 Coke 44, *a.*; 7 Cranch 32; 4 Bla. Comm. 2 6.

It is said even that courts not of record and having no general power to fine and imprison, may punish, *instanter*, acts of misbehavior done in the presence of the court; *Hollingsworth* v. *Duane,* Wallace 77.

In Vermont, justices' courts are courts of record. Their jurisdiction is important and extensive, and in many matters is final and exclusive. They have the power to fine and imprison.

The power to punish for contempt is indispensable to the proper discharge of their duties by magistrates. Without it the magis-

18

trate would be in a pitiable condition, compelled to hold court, to investigate controversies, examine witnesses and listen to arguments, and yet powerless to secure order in his proceedings, to enforce obedience to his decisions, to repress turbulence, or even to protect himself from insult. The mere power to remove disorderly persons from his court room would be wholly inadequate to secure, either the proper transaction and dispatch of business, or the respect and obedience due to the court and necessary for the administration of justice.

There is nothing in the character of our justice courts to justify apprehension of danger and tyranny from the abuse of the power; on the contrary, its occasional use might be found salutary in checking disorders that sometimes prevail in them.

Against any tyrannical or malicious exercise of this power we have ample safeguards in the attachment of our people to personal rights and liberty, in the publicity that attends the proceedings of magistrates, and in the vigilance and independence of counsel to resist encroachments upon their own rights or those of their clients.

Petition dismissed, and the relator remanded to the custody of the sheriff.